**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SARA C.,<br><br>Plaintiff, | : | |
| v. | : | Civil No. 3:25-cv-626(RAR) |
| COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | : | |

RULING ON PLAINTIFF'S MOTION TO REVERSE AND/OR REMAND AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Sara C. ("Plaintiff") appeals the final decision of the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. § 405 (g). The Commissioner denied Plaintiff's application for Social Security Disability Benefits in a decision dated August 30, 2023. Plaintiff timely appealed to this Court. (Dkt. #1.) Currently pending are Plaintiff's Motion for an Order Reversing the Decision of the Commissioner, dkt. #16, and Defendant's Motion for an Order Affirming the Decision of the Commissioner, dkt. #19. For the reasons that follow, Plaintiff's Motion to Reverse, or in the Alternative, Remand, is DENIED and the Commissioner's Motion to Affirm is GRANTED.

## I. LEGAL STANDARD

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).[1] "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive." 42 U.S.C. § 405(g). Accordingly, the court may not make a de novo determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Id.*; *Wagner v. Sec'y of Health and Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching his conclusion, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Further, if the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

The Second Circuit Court of Appeals has defined substantial evidence as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence must be "more than a scintilla or touch of proof here and there in the record." *Williams*, 859 F.2d at 258.

The Social Security Act ("SSA") provides that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1). To determine whether an individual is disabled within the meaning of the SSA, the Administrative Law Judge ("ALJ") must follow a five-step evaluation process as promulgated by the Commissioner.[2]

[2] The five steps are as follows: (1) the Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him or her disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform

To be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). "[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*[3]

II. PROCEDURAL HISTORY

On February 3, 2015, Plaintiff filed for disability insurance benefits by way of a Title II application, citing alleged disability beginning January 1, 1986. (R. 347-353.)[4] Plaintiff's claim was initially denied on August 7, 2015, and upon reconsideration on January 14, 2016. (R. 143, 153, 157.) Plaintiff subsequently filed a request for a hearing, which was held on June 14, 2017 by Administrative Law Judge Edward Sweeney. (R. 82-123.) During the hearing, ALJ Sweeney confirmed through Plaintiff's counsel that Plaintiff's alleged onset date

his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. 20 C.F.R. §416.920(a)(4)(i)-(v).

[3] The determination of whether such work exists in the national economy is made without regard to (1) "whether such work exists in the immediate area in which [the claimant] lives;" (2) "whether a specific job vacancy exists for [the claimant];" or (3) "whether [the claimant] would be hired if he applied for work." *Id.*

[4] The Court cites pages within the administrative record as "R. ___."

was January 1, 2010 (rather than January 1, 1986).[5] (R. 88.) Following the hearing, ALJ Sweeney issued a written decision denying Plaintiff's application on July 14, 2017. (R. 154-173.) Plaintiff thereafter sought review by the Appeals Council, and the Appeals Council remanded the matter for further proceedings. (R. 176-178.)

Following an additional hearing, R. 40-81, ALJ Sweeney issued an unfavorable decision again denying Plaintiff's application on November 18, 2019. (R. 12-39.) Plaintiff sought review by the Appeals Council, and the request was denied. (R. 1-6.) Plaintiff then filed an action in this Court, seeking judicial review of the denial. *See Sara C. v. Saul*, No. 3:20-cv-1520 (SRU). Shortly thereafter, the parties filed a consent motion to remand, which the Court granted, and judgment entered on April 6, 2021. (R. 1586-1588.) The Appeals Council remanded the matter to the ALJ to reevaluate Plaintiff's maximum residual functional capacity ("RFC") and clarify the effect of any limitations on Plaintiff's occupational base. (R. 1589-1593.)

ALJ Louis Bonsangue ("the ALJ") held an additional hearing on November 9, 2021, R. 1555-1585, and issued an unfavorable decision on February 24, 2022, R. 1526-1554. The Appeals Council

[5] The Court notes that the parties dispute the circumstances by which Plaintiff's alleged onset date was changed from January 1, 1986 to January 1, 2010. *See* dkt. #16-1 at 1; dkt. #19-1 at 3. The Court cites to the transcript of the first oral hearing, where the ALJ confirmed through Plaintiff's counsel that the alleged onset date was January 1, 2010. (R. 88.)

declined to assume jurisdiction over the matter. (R. 1519-1522.) Plaintiff then filed another action in this Court. *See Sara C. v. Kijakazi*, No. 3:22-cv-1011 (KAD). The parties again moved to remand the matter, the Court granted the request, and judgment entered on February 2, 2023. (R. 2065-2068.) The Appeals Council remanded the matter to the ALJ to reevaluate Plaintiff's maximum RFC and selected opinion evidence, and to determine whether expanding the record to include prior evidence is warranted. (R. 2069-2073.)

A hearing was held on July 12, 2023. (R. 2000-2028.) The ALJ issued a written decision, finding that Plaintiff was not disabled from January 1, 2010, through the date last insured of December 31, 2012. (R. 1969-1999.) The ALJ's decision became final when the Appeals Council declined to assume jurisdiction over the matter. (R. 1957-1963.) Plaintiff then timely filed this action seeking judicial review of the denial of benefits. (Dkt. #1.)

III. <u>THE ALJ'S DECISION</u>

After applying the five-step evaluation process, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act from her alleged onset date of January 1, 2010, through the date of Plaintiff's date last insured ("DLI"), December 31, 2012. (R. 1972-1988). At Step One, the ALJ

determined that Plaintiff had not engaged in substantial gainful activity between her alleged onset date and the DLI. (R. 1975.)

At Step Two, the ALJ found that Plaintiff had the following severe impairments: anxiety disorder, affective and mood disorders, and post-traumatic stress disorder ("PTSD"). (R. 1975.)

At Step Three, the ALJ determined that Plaintiff's severe impairments did not meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpt. P, App. 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). (R. 1975-1977.) Specifically, the ALJ determined that the severity of Plaintiff's mental impairments did not meet or medically equal the criteria of Listings 12.04, 12.06, and 12.15. (R. 1975.) In reaching this conclusion, the ALJ found that Plaintiff did not meet "paragraph B" criteria, which requires a mental impairment to result in one extreme limitation or two marked limitations. *Id.* at 1975-77. The ALJ also considered whether "paragraph C" criteria were met and found that they were not because there was "no evidence of marginal adjustment, i.e., minimal capacity to adapt to changes in [Plaintiff's] environment or to demands that are not already part of her daily life." *Id.* at 1977.

At Step Four, the ALJ found that through the DLI, Plaintiff retained the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations:

> She is limited to simple, routine, and repetitive tasks for two-hour periods with customary breaks. She should not be required to work at any fast-paced environments; for example, with no conveyer-belt pace work, and with no strict adherence to quotas, such as hourly quotas. She should not be required to work collaboratively or as part of a team with coworkers and supervisors, and should not be required to work directly with the public. She can tolerate and adapt to infrequent changes in the work routine on a day-to-day basis.

(R. 1977.).

Finally, at Step Five, the ALJ concluded that Plaintiff was not able to perform any past relevant work, but there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed, including Routing Clerk, Mail Clerk, and Marker. (R. 1986-1987.)

## IV. DISCUSSION

In support of her Motion to Reverse or Remand the Decision of the Commissioner, Plaintiff advances eight different arguments. (Dkt. #16-1 at 19-40.) First, Plaintiff argues that the ALJ failed to obtain the social security files from her prior application for benefits. *Id.* at 19-20. Second, Plaintiff argues that the ALJ failed to make credibility determinations in accordance with 20 C.F.R. § 404.1529 and Social Security Ruling ("SSR") 16-3p. *Id.* at 20-26. Third, Plaintiff argues that substantial evidence does not support the RFC. *Id.* at 26-27. Fourth, Plaintiff argues that the ALJ failed to acknowledge and apply the treating physician rule. *Id.* at 27-34. Fifth,

Plaintiff argues that the ALJ failed to weigh non-medical opinions in accordance with the required weighing factors. *Id.* at 34-36. Sixth, Plaintiff argues that the ALJ failed to properly evaluate the opinion from the Connecticut Judicial System. *Id.* at 36-37. Seventh, Plaintiff argues that the ALJ failed to properly resolve a conflict between the hearing testimony of a vocational expert and the Dictionary of Occupational Titles. *Id.* at 37-39. Finally, Plaintiff argues that the ALJ erred in relying on vocational expert testimony that failed to include a methodology upon which job incidence testimony could have been derived. *Id.* at 39-40.

Defendant responds to each of Plaintiff's arguments, as addressed more fully below.(Dkt. #19-1 at 6-29.)

### A. The ALJ Did Not Err as a Matter of Law or Fail to Develop the Record by Not Combining Social Security Files

First, Plaintiff argues in her Motion to Reverse that the ALJ erred in failing to obtain the administrative record from her prior application for benefits. (Dkt. #16-1 at 19-20.) Plaintiff states that she filed an application for disability benefits on March 11, 2010, and that the application was dismissed at the hearing level on March 10, 2012. *Id.* at 19. Plaintiff filed the current application for benefits in February of 2015. *Id.* According to Plaintiff, the medical and administrative record from the March 10, 2012, dismissal were

not admitted into the record at the 2023 hearing. *Id.* Plaintiff argues that this was erroneous because the 2012 administrative record overlaps with the relevant timeframe in the February 2015 claim, and therefore "[t]he initial decision maker of the current claim reopened the previous time frame." *Id.* at 19-20.

To support her argument, Plaintiff relies on Section HA 012010.013 of the Hearings, Appeals, and Litigation Law Manual ("HALLEX"), which directs an ALJ "to review a prior claim(s) file in order to fully adjudicate a current claim" in certain instances. (Dkt. #16-1 at 19 (citing HA 012010.013(A)).) One such instance is when "[t]he pending claim involves a possible reopening," which Plaintiff relies on here. *Id.* (citing HA 012010.013(b)(1)).

In response, Defendant points to the Program Operations Manual System ("POMS")[6], and argues that POMS is "an internal policy and procedure manual that lacks the force of law" and is "not binding on the Commissioner." (Dkt #19-1 at 6 (citing *Vasquez v. Kijakazi*, No. 3:17-cv-183 (RMS), 2021 U.S. Dist. LEXIS 135673, at *6 (D. Conn. July 21, 2021).)) Defendant

[6] The parties refer to this source differently in their respective briefs. Defendant refers to the Program Operations Manual System ("POMS") while Plaintiff refers to the Hearings, Appeals, and Litigation Law Manual ("HALLEX"). The exact provision at issue here appears to derive from HALLEX, which is a Social Security Administration publication that "conveys guiding principles, procedural guidance, and information to hearing level and Appeals Council staff." HA 01105.001. The Court therefore considers the nature of the HALLEX's authority, and not the POMS.

further argues that the ALJ appropriately admitted medical evidence from the prior file. (Dkt. #19-1 at 6-7.) Finally, Defendant argues in a footnote that Plaintiff's previous Title II application was not reopened, thus refuting HA 012010.013's grounds for reviewing a prior file on which Plaintiff relies. *Id.* n. 6.

While the Second Circuit has not conclusively determined whether the HALLEX is binding authority, "[d]istrict courts in this Circuit have nevertheless held it is not." *Sabrina S. v. Colvin*, No. 24-cv-1915 (MPS), 2026 U.S. Dist. LEXIS 60375, at *7 (D. Conn. Mar. 23, 2026) (finding that an ALJ's failure to abide by the HALLEX was not a basis for remand).

In any event, the ALJ here *did* admit over 140 pages of medical evidence from the prior file into the current file. R. 1973. The 2023 remand order from the Appeals Council directed the ALJ to consider whether "some of the mental health treatment notes and the emergency room visit for suicidal ideation in July 2010" should be admitted under the HALLEX. R. 2072. The ALJ stated that, "[i]n compliance with the remand order, medical evidence from the prior file, which relates to the period at issue in the present case, was admitted, exhibited at Exhibits B41F to B47F." R.1973; *see* R. 2361-2508. The ALJ analyzed the relevant treatment records in the hearing decision, R. 1979-80, and Plaintiff fails to identify any piece of evidence that was

improperly omitted in the instant action. The Court finds that the ALJ properly developed the record. *Janes v. Berryhill*, 710 Fed. App'x 33, 34 (2d Cir. 2018) ("The ALJ is not required to develop the record any further when the evidence already presented is 'adequate for [the ALJ] to make a determination as to disability.'") (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)).

In her Reply Brief, Plaintiff focuses on the issue raised by Defendant as to whether the previous Title II application was reopened in this current action (Plaintiff argues that it was). (Dkt. #22 at 1-2.) The Court need not reach that issue because the ALJ properly admitted medical evidence from the prior file in accordance with the remand order, the record is properly developed, and Plaintiff does not identify what evidence is missing and/or the effect of the missing evidence in this action. There is no reversible error.

**B. The ALJ Properly Formulated the RFC**

Plaintiff next argues that the ALJ made improper negative credibility determinations, and that substantial evidence does not support her RFC.[7] (Dkt. #16-1 at 20-36.) In response, Defendant argues that the ALJ properly evaluated the evidence in the record to reach the RFC. (Dkt. #19-1 at 7-24.)

---

[7] While stylized as distinct arguments in Plaintiff's brief, *see* dkt. #16-1 at 20-36, the Court construes these arguments as essentially building off one another and will address them as a single argument.

When an individual's impairment does not meet or equal a listed impairment, the ALJ will "make a finding [of the individual's] residual functional capacity based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). An individual's RFC is the most an individual can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). Plaintiff has the burden of establishing a diminished RFC. *See Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). When formulating an appropriate RFC, the ALJ is required to review and evaluate all medical records and opinions. 20 C.F.R. § 404.1527(b),(c).

If the court does not find that the RFC determination was subject to a legal error, the issue becomes one of substantial evidence. "[W]hether there is substantial evidence supporting the appellant's view is not the question here; rather, [the court] must decide whether substantial evidence supports the ALJ's decision." *Bonet v. Colvin*, 523 Fed. App'x 58, 59 (2d Cir. 2013)(summary order). Analogously, "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

It is well established that "an ALJ is not required to discuss every shred of evidence in the record in reaching a conclusion — rather, the ALJ must articulate how the disability determination is supported by substantial evidence, and provide

an explanation that allows for meaningful review on appeal." *Vanessa N. v. Comm'r of Soc. Sec.*, No. 1:23-CV-00913 EAW, 2024 WL 4131242, at *5 (W.D.N.Y. Sept. 9, 2024) (citing *Brault v. Comm'r of Soc. Sec.*, 683 F.3d 444, 448 (2d Cir. 2012)).

A reviewing court does not "decide the facts anew, nor [] reweigh the facts, nor [] substitute its judgment for the judgment of the ALJ. Rather, the decision of the ALJ must be affirmed if it is based upon substantial evidence even if the evidence would also support a decision for the plaintiff." *Bellamy v. Apfel*, 110 F. Supp. 2d 81, 87 (D. Conn. 2000). "Indeed, [t]he fact that [plaintiff] does not agree with [the ALJ's] findings, does not show that the ALJ failed to comply with the applicable standards." *Gina C. v. Comm'r of Soc. Sec. Admin.*, No. 3:21CV00423(SALM), 2022 WL 167922, at *10 (D. Conn. Jan. 18, 2022).

The ALJ in this case formulated an RFC finding that Plaintiff was capable of a full range of work at all exertional levels, with the following non-exertional limitations:

> [Plaintiff] is limited to simple, routine, and repetitive tasks for two-hour periods with customary breaks. She should not be required to work at any fast-paced environments; for example, with no conveyer-belt pace work, and with no strict adherence to quotas, such as hourly quotas. She should not be required to work collaboratively or as part of a team with coworkers and supervisors, and should not be required to work directly with the public. She can tolerate and adapt to infrequent changes in the work routine on a day-to-day basis.

(R. 1977.)

In making this finding, the ALJ, as is required, evaluated the medical evidence and considered all of Plaintiff's complaints and symptoms. First, the ALJ considered Plaintiff's subjective complaints, including complaints from the 2021 and 2023 administrative hearings. (R. 1977-78.) The ALJ specifically noted that Plaintiff "reported she is unable to work due to anxiety and mood disorders, which causes racing thoughts and difficulty tolerating stress and changes in routine and problems getting along with others." *Id.* The ALJ further noted that, according to Plaintiff, Plaintiff "relies heavily on her husband" to complete daily tasks, including performing housework, managing finances, and taking care of their two children. *Id.* at 1978.

While the ALJ noted that Plaintiff's medical impairments can reasonably be expected to cause Plaintiff's alleged symptoms, the ALJ explained that Plaintiff's statements regarding the intensity, persistence, and limiting effects of these symptoms are not fully consistent with the evidence of record and did not support "the alleged loss of functioning," as discussed more fully below. (R. 1978.)

The ALJ continued with a review of the medical records from Dr. John Santopietro at the Enfield Adult Outpatient Center. (R. 1979.) The ALJ noted that in 2009, Dr. Santopietro diagnosed

Plaintiff with complex PTSD and prescribed Plaintiff with Buspar. *Id.* In reviewing the records, the ALJ acknowledged Plaintiff's "long history of sexual abuse." *Id.* The ALJ noted that Plaintiff's "capacity to improve in treatment was limited by her not going to therapy." (R. 1979.) The ALJ went on to note that Plaintiff began psychotherapy and "reported some improvement in 2009." *Id.*

The ALJ also noted that the treatment records from Dr. Santopietro from early 2010 indicated "generally unremarkable mental status examination findings" and noted that Plaintiff "reported no side effects from prescribed Cymbalta and Buspar." *Id.* The ALJ noted that Plaintiff was also referred for a partial hospitalization plan ("PHP") "where she admitted suicidal thoughts without plan" and "appeared anxious but was otherwise cognitively intact." *Id.* As noted by the ALJ, Plaintiff only attended the PHP for a few weeks "because her roommates didn't want her to go." (R. 1979 (quoting R. 2406).)

The ALJ continued his evaluation of the record and discussed Plaintiff's treatment at Yale New Haven Hospital. (R. 1979.) The ALJ noted that in July 2010, Plaintiff presented to Yale New Haven Hospital for suicidal ideation and depression, and exhibited "a sad and anxious mood, labile and tearful effect, and endorsed recent auditory hallucinations" but was noted as being "cognitively intact" and was discharged that same

day after denying suicidal ideations.[8] (R. 1979.) The ALJ noted that, in September 2010, Plaintiff was admitted to an intensive outpatient program at Yale New Haven Hospital for depression, but Plaintiff "denied suicidal ideations" and the discharge notes indicated that Plaintiff missed six days but otherwise improved with treatment. (R. 1979 (citing R. 2481-2493).) The ALJ also noted that Plaintiff's major depressive disorder was recurrent but in partial remission. *Id.* (citing 2487.)

The ALJ continued with a review of the treatment records from Plaintiff's February 2011 inpatient stay at St. Raphael Hospital "for bipolar affective disorder and suicidal thoughts." (R. 1980.) Plaintiff was noted to be "generally euthymic," happy, and "generally cognitively intact." *Id.* (citing R. 753-755, 757.) The ALJ further noted that Plaintiff presented with a "dysphoric mood, slow speech . . . and isolative tendencies only when discharge plans or her unstable housing situation were discussed." *Id.* (citing R. 755.) The ALJ noted that Plaintiff admitted to intermittent non-compliance with medications, but ultimately Plaintiff improved with treatment and denied suicidal ideations upon discharge. (R. 1980 (citing R. 753-758).)

The ALJ noted that Plaintiff was readmitted to the hospital on June 26, 2011 for anxiety. (R. 1980 (citing R. 759-62).)

---

[8] According to the ALJ, Plaintiff was admitted to an outpatient health center shortly thereafter and was discharged after a week "after attending only two session and did not return to complete paperwork." (R. 1979.)

Plaintiff's psychiatric examination showed that she had a normal mood and effect, normal cognition, and a normal thought process, but that her insight and judgment were abnormal because she did not understand her illness. *Id.* The ALJ also noted that Plaintiff was alert, fully oriented, had normal speech, and appeared calm. *Id.* During that visit, Plaintiff was "found to have chronic bipolar disorder and anxiety reaction." *Id.* (citing R. 759-762.)

Continuing on, the ALJ noted that Plaintiff reestablished treatment at the Genesis Center in early 2012. (R. 1980 (citing R. 614.) According to the ALJ, "[t]reatment staff noted that while [Plaintiff's] conditions cause problems in her occupational functioning and relationships . . . she has done quite well despite her trauma history, and her medications were adjusted." (R. 1980 (citing R. 623, 625).) The ALJ noted that Trileptal was increased to help improve Plaintiff's mood. *Id.*

The ALJ finally noted treatment records from the Genesis Center in May of 2012. (R. 1980.) At that time, Plaintiff presented with "pressured speech, labile affect, [and] mildly impaired memory and concentration," and her Atarax was increased. *Id.* (citing R. 597.) The ALJ noted that Plaintiff ultimately cancelled upcoming appointments and was discharged from the Enfield Adult Outpatient Center because she was moving out of the area. *Id.* (citing R. 601-602.) According to the ALJ,

the remaining treatment notes "do not show treatment for anything other than some transient physical problems." *Id.* at 1981 (citing R. 832-913; R. 2457.)

The Court pauses here to highlight that the ALJ spent considerable time reviewing and analyzing the treatments records related to Plaintiff's mental health. Contrary to Plaintiff's position that substantial evidence does not support the RFC, the ALJ considered Plaintiff's mental health conditions and the potentially limiting effects that they create. By nature of the RFC limitations imposed — that is, restricting Plaintiff to simple, routine, and repetitive tasks with breaks and noting that Plaintiff should not be required to work collaboratively or as part of a team – Plaintiff's mental health conditions will be aided or addressed to some degree.

To conclude the review of the medical evidence in forming the RFC, the ALJ analyzed the medical opinion evidence in the record. The ALJ gave partial weight to the medical opinion of State agency psychological consultant Dr. Killenberg. (R. 1981.) The ALJ noted that Dr. Killenberg opined that Plaintiff could understand simple instructions and carry out simple tasks in a non-pressured work environment. (R. 1981 (citing R. 138-40.)) The ALJ stated that he accounted for these limitations when formulating the RFC by limiting Plaintiff to simple, routine, and repetitive tasks with no fast-paced work. (R. 1981.) The ALJ

rejected Dr. Killenberg's opinion insofar as it opined that Plaintiff "may require initial special supervision" due to "limited work experience." *Id.* at 1982 (citing R. 139.) The ALJ noted that "limited work experience" was a vocational, rather than medical, consideration. (R. 1982.)

Next, the ALJ analyzed the medical opinions from Plaintiff's psychiatrist, Dr. Teodora Andrei, M.D. (R. 1982.) The ALJ afforded little weight to Dr. Andrei's opinions. *Id.*

The Court first addresses the treating physician rule, and its applicability to Dr. Andrei's opinions. Because Plaintiff applied for benefits before March 27, 2017, the treating physician rule, rather than the revised regulations, applies to a treating source's opinion. The treating physician rule stipulates that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2)). Conversely, "[a] treating physician's opinion need not be given controlling weight where it is not well-supported or is not consistent with the opinions of other medical experts" where those other opinions amount to "substantial evidence to

undermine the opinion of the treating physician." *Mariani v. Colvin*, 567 F. App'x 8, 10 (2d Cir. 2014).

Plaintiff argues that the ALJ violated the treating physician rule with respect to his evaluation of Dr. Andrei. (Dkt. #16-1 at 27-30.) Specifically, Plaintiff argues that the ALJ did not make a determination as to whether the opinions of Dr. Andrei were "well-supported by medically acceptable clinical and laboratory diagnostic techniques," or whether they were "inconsistent with the other substantial evidence in the case record," and that this was in error. *Id.* at 28 (citing 20 C.F.R. § 404.1527). In response, Defendant argues that Dr. Andrei did not qualify as Plaintiff's "treating source" under the regulations because Dr. Andrei did not treat Plaintiff during the relevant period. (Dkt. #19-1 at 17-19.) The Court agrees with Defendant on this point.

A physician who does not treat a plaintiff during the period between plaintiff's alleged onset date and DLI does not qualify as a treating physician. *Monette v. Astrue*, 269 Fed. App'x 109, 112-13 (2d Cir. 2008). Nonetheless, "the fact that a treating physician did not have that status at the time referenced in a retrospective opinion does not mean that the opinion should not be given some, or even significant weight." *Id.* at 113. Where there is substantial evidence in the record to demonstrate that an opinion is inconsistent with the record, an

ALJ does not err by refusing the accord the opinion significant weight. *Id.*

Dr. Andrei started treating Plaintiff in May of 2014, which is over a year after the DLI. R. 1982 (citing R. 702-704).) Because Dr. Andrei did not treat Plaintiff during the relevant time period, Dr. Andrei is not a treating physician. *Monette*, 269 Fed. App'x at 112-13. As a later treating source, Dr. Andrei's opinion is entitled to significant weight if the opinion is consistent with the record and is supported by medically accepted clinical diagnostic techniques. *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981).

Here, the ALJ determined that Dr. Andrei's opinions were inconsistent with the record and afforded them little weight.[9] (R. 1982-84.) Substantial evidence supports the ALJ's determination that Dr. Andrei's opinions were inconsistent with the record. First, the ALJ notes that Dr. Andrei's treating record states that Dr. Andrei reviewed the prior record, but fails to specify what records were actually reviewed. (R. 1983 (citing R. 1954).) Moreover, the ALJ notes that it is unclear whether Dr. Andrei "actually reviewed the records dated prior to the date last insured." (R. 1983.)

[9] The ALJ also afforded little weight to Dr. Andrei's medical opinions because Dr. Andrei did not treat Plaintiff during the relevant time period. (R. 1982.)

The ALJ also noted internal inconsistencies with Dr. Andrei's opinions. For example, the ALJ pointed out that in one opinion, Dr. Andrei assessed that Plaintiff had *marked* or *extreme* difficulties in understanding or applying information. (R. 1983 (citing R. 977.)) Just below this, Dr. Andrei assessed that Plaintiff's difficulties in these same categories were "all *moderate* when experiencing symptoms of PTSD." (R. 1983 (quoting R. 977.) (emphasis added)) The ALJ also noted that Dr. Andrei opined that Plaintiff had marginal adjustment, and had periods of deterioration that made it difficult for Plaintiff to sustain work activity. (R. 1983 (citing R. 978-79).) The ALJ noted that these findings are "inconsistent with the [Plaintiff's] ability to care for herself and [her] improvement . . . when compliant with treatment." (R. 1983 (citing R. 596-639).) The ALJ's determination with respect to Dr. Andrei's opinions were supported by substantial evidence.

Continuing with a review of the opinion evidence, the Court next turns to the ALJ's evaluation of Dr. Billings Fuess's opinion. Dr. Fuess was a non-treating non-examining medical expert that testified at the August 2019 hearing, and the ALJ afforded "significant weight to most of the opinion" of Dr. Fuess. (R. 1984.) The ALJ noted that Dr. Fuess found that Plaintiff had "mild to moderate limitations in mental functioning" and that Dr. Fuess reviewed the administrative

record and relied on treatment notes in reaching this conclusion. (R. 1984.) Specifically, the ALJ noted that Dr. Fuess's opinion was "supported by the [Plaintiff's] treatment notes, which show[ed] that her mental condition improved with treatment." *Id.* (citing R. 596-639, 2361-2508). However, the ALJ disagreed with Dr. Fuess's opinion to the extent it found that Plaintiff only had mild limitations in interacting with others. (R. 1984.) The ALJ noted that this finding departed from the record, including Plaintiff's own testimony regarding her difficulty dealing with others. *Id.* The ALJ accounted for this discrepancy in finding that Plaintiff had a moderate limitation in interacting with others. *Id.*; R. 1976.

Plaintiff argues that the ALJ's evaluation of Dr. Fuess's medical opinions was erroneous. (Dkt. #16-1 at 32-34.) Plaintiff first argues that the ALJ erred in limiting the record upon which Dr. Fuess could rely. ( Dkt. #16-1 at 32-33.) According to Plaintiff, "[m]any records" were added after Dr. Fuess testified.[10] *Id.* at 32. Plaintiff also argues that it was error for the ALJ to reject Dr. Andrei's opinion for postdating the DLI, while accepting Dr. Fuess's opinion which also postdated the DLI. *Id.* at 33-34.

[10] The ALJ states in the opinion that "[t]he medical evidence submitted after [Dr. Fuess] rendered his opinion was not applicable to the period under adjudication." (R. 1984.)

While Plaintiff's points are well-taken, neither point constitutes reversible error. The ALJ's evaluation of Dr. Fuess's opinion is subject to the substantial evidence standard of review, *see* 42 U.S.C. § 405(g), and this deferential standard prevents the Court from reweighing evidence, even if Plaintiff disagrees with how it was weighed. *See Krull v. Colvin*, 669 Fed. App'x 31, 32 (2d Cir. 2016) (noting that plaintiff's "disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents [the court] from reweighing it"). Here, the ALJ found that Dr. Fuess's opinion was consistent with the treatment notes in the record, which indicated that Plaintiff's symptoms improved with treatment. (R. 1984.) The Court finds that the ALJ properly evaluated the medical opinion of Dr. Fuess.[11]

Next, the ALJ analyzed Plaintiff's Global Assessment Functioning ("GAF")[12] scores. (R. 1984-85.) The ALJ afforded little weight to the GAFs ranging from 31-50 and explained that he did so due to Plaintiff's non-compliance, Plaintiff's abilities to care for herself, and "[a]dditional socioeconomic

[11] To the extent that Plaintiff believes the ALJ erred in rejecting Dr. Andrei's opinions for postdating the DLI while accepting Dr. Fuess's opinion, the Court notes that the ALJ went on to evaluate Dr. Andrei's opinions and the rejection was not solely founded on untimeliness. *See* R. 1982-83.
[12] A Global Assessment Functioning score, or a "GAF," "is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n. 1 (2d Cir. 2008) (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000)).

factors." *Id.* The ALJ afforded *some* weight to the GAF scores of 51 or above, explaining that these scores were a "more accurate depiction of [Plaintiff's] condition with proper treatment." (R. 1985.)

Plaintiff argues that the ALJ erred as a matter of law in his evaluation of Plaintiff's GAF scores. (Dkt. #16-1 at 31-32.) According to Plaintiff, "[a] GAF score is a medical opinion and is to be evaluated along with the treating physician rule." *Id.* at 31. In response, Defendant correctly points out that "a GAF score does not itself necessarily reveal a particular type of limitation and is not an assessment of a claimant's ability to work." (Dkt. #19-1 at 21 (quoting *Tiffany T. v. Comm'r of Soc. Sec.*, No. 3:22-cv-626 (VAB), 2024 U.S. Dist. LEXIS 51194, at *14 (D. Conn. Mar. 22, 2024).) And as this Court noted in *Tiffany T.*, "an ALJ's failure to consider every GAF score is not a reversible error." *Tiffany T.*, 2024 U.S. Dist. LEXIS 51194, at *14 (citation omitted).

Contrary to Plaintiff's contention, the ALJ here did not err in discounting the low GAF scores. Rather, the ALJ considered the treatment notes that were analyzed earlier in the decision and found that the low GAF scores were inconsistent with the record, while the higher GAF scores were consistent with the record. (R. 1984-85.) And "the Social Security Administration has concluded [that], [u]nless the GAF rating is

well supported and consistent with other evidence in the file, it is entitled to little weight under our rules." *Warrick v. Saul*, No. 3:19-cv-674 (SALM), 2020 U.S. Dist. LEXIS 87755, at *13 (D. Conn. May 19, 2020) (internal quotation marks and citation omitted). The ALJ properly evaluated Plaintiff's GAF scores.

Finally, the ALJ considered the non-medical opinions, including the opinion of Plaintiff's husband and mother. (R. 1985.) The ALJ afforded little weight to both non-medical opinions. *Id.* Plaintiff argues that it was error for the ALJ to discount the non-medical sources for not being acceptable medical sources. (Dkt. #16-1 at 34-36.) While Plaintiff does not argue that the non-medical opinions must be adopted, Plaintiff does argue that the reasons provided by the ALJ for discounting the non-medical opinions are insufficient. *Id.* at 35-36. Defendant argues that the ALJ's evaluation of the non-medical opinions was proper because the non-medical opinions failed to provide a function-by-function assessment of Plaintiff's limitations and were inconsistent with treatment notes. (Dkt. #19-1 at 23-24.)

While Plaintiff is correct that "[a]n ALJ should not reject the opinion of a non-medical treating source based solely on the fact that the source is not 'medical,'" an "ALJ has the discretion to discount such opinion evidence if it is

contradicted by objective medical evidence and opinions of medical consultants." *George v. Saul*, No. 3:19-cv-1456 (JAM), 2020 U.S. Dist. LEXIS 190076, at *10 (D. Conn. Oct. 14, 2020). Here, contrary to Plaintiff's assertion, the ALJ did not reject the non-medical opinions in a blanket fashion for not being acceptable medical sources. Rather, the ALJ analyzed the non-medical opinions and found that they were inconsistent with the treatment records. (R. 1985-86.)

For example, the ALJ noted that Plaintiff's husband's opinion that Plaintiff is disabled "is inconsistent with the [Plaintiff's] treatment notes showing that her depression and anxiety generally improved with treatment." (R. 1985.) The ALJ supported this statement with citations to the record. *Id.* (citing R. 596-639, 2361-2508). Likewise, while the ALJ acknowledged that the statement from Plaintiff's mother "provide[d] a detailed and helpful revelation of the [Plaintiff's] trauma history," he noted that she was "unable to provide a functional assessment of the [Plaintiff's] abilities and limitations." (R. 1985.) The ALJ also noted that the statement by Plaintiff's mother was inconsistent with the record as it related to Plaintiff's memory and concentration. *Id.* In light of these evaluations, the ALJ properly considered the non-medical source opinions and acted within his discretion in

concluding that the opinions were not supported by the rest of the record.

Considering the RFC as a whole, the Court finds that the ALJ properly evaluated the evidence in the record to determine that Plaintiff's allegations of symptoms are not supported by the medical evidence and treatment notes, and that the ALJ did not err in evaluating the opinion evidence. "[W]hether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision." *Bonet v. Colvin*, 523 Fed. App'x 58, 59 (2d Cir. 2013) (summary order). Here, the Court is satisfied that it does.

While Plaintiff argues that the ALJ erroneously weighed Plaintiff's treatment noncompliance in making a negative credibility assessment, dkt. #16-1 at 20-26, the Court notes that Plaintiff's noncompliance was but one factor considered by the ALJ in making a credibility determination. (R. 1978-1986.) And in the Second Circuit, "[c]redibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'" *Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997). Based on the ALJ's evaluation of the record, the Court

cannot conclude that the ALJ's credibility finding was "patently unreasonable" or otherwise constituted reversible error.[13]

Given the totality of the ALJ's discussion regarding the treatment records and medical opinion evidence, the Court is satisfied that the ALJ properly formulated Plaintiff's RFC. The Court addresses two final points below.

### C. The ALJ Did Not Err in the Evaluation of Plaintiff's Participation in the Jail Diversion Program

Plaintiff argues that the ALJ erred in failing to evaluate Plaintiff's acceptance and participation in the Connecticut Judicial System's supervised diversionary program.[14] (Dkt. #16-1 at 36-37.) Plaintiff appears to argue that because Plaintiff was considered "disabled" for purposes of the diversionary program, the ALJ should have conducted an analysis of that disability determination.(Dkt. #16-1 at 36-37.) In response, Defendant argues that the ALJ was not required to provide an analysis of

[13] Plaintiff argues that the ALJ failed to consider possible explanations for Plaintiff's treatment noncompliance, as required by SSR 16-3p. Dkt. #16-1 at 21-25; *see* SSR 16-3p, 2016 SSR LEXIS 4, at *23 ("We will not find an individual's symptoms inconsistent with the evidence in the record on th[e] basis [of noncompliance] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.") However, where noncompliance is one of several factors considered when assessing a plaintiff's credibility (as here), a failure to consider a plaintiff's explanations is harmless error. *Gonzalez v. Berryhill*, No. 3:17-cv-1385 (SALM), 2018 U.S. Dist. LEXIS 139642, at *16-17 (D. Conn. Aug. 17, 2018). Because the ALJ's analysis as a whole is supported by substantial evidence, the Court finds no error warranting remand.

[14] In support of this argument, Plaintiff directs this Court to Connecticut General Statute § 54-56l, which states that the program is "for persons with psychiatric disabilities" and that a "psychiatric disability" is defined as a "mental or emotional condition, other than solely substance abuse, that (A) has substantial adverse effects on the defendant's ability to function, and (B) requires care and treatment." Conn. Gen. Stat. § 54-56l(a).

that determination, and that the ALJ reasonably drew a negative inference from Plaintiff's participation in the program. (Dkt. #19-1 at 22-23.)

Plaintiff concedes that the ALJ is not bound by another entity's determination that a claimant is disabled. Dkt. #16-1 at 36; *see also* 20 C.F.R. 404.1504 (noting that "a decision by any other governmental agency or a nongovernmental entity about whether you are disabled . . . is not binding on us and is not our decision about whether you are disabled"). Although Plaintiff argues that the ALJ erred in failing to evaluate the opinion from the supervised diversionary program, dkt. #16-1 at 36, the Court disagrees. The ALJ acknowledged that Plaintiff participated in the program. (R. 1978, 1980.) And while the ALJ noted Plaintiff's mandated participation as a negative factor, *see id.*, the ALJ supported this finding with evidence from the record regarding Plaintiff's periods of non-compliance with treatment. (R. 1980 (citing R. 754-775).) Even if Plaintiff disagrees with the ALJ's consideration of the evidence, the decision may be properly sustained as long as it is supported by substantial evidence. *See Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982). The Court finds that the ALJ did not err in his evaluation of Plaintiff's participation in the supervised diversionary program.

### D. The ALJ Properly Evaluated the Vocational Expert's Testimony in Making a Step Five Finding

Finally, Plaintiff argues that the ALJ erred in his evaluation of the vocational expert ("VE") testimony, and that the ALJ's Step Five conclusion is improper. (Dkt. #16-1 at 37-40.) At the hearing, the VE testified that a hypothetical individual with Plaintiff's RFC could perform the following occupations: Routing Clerk, Mail Clerk, and Marker. (R. 2017.) Based on this testimony, the ALJ concluded that Plaintiff could perform other work existing in significant numbers in the national economy. (R. 1987.)

Plaintiff first argues that the ALJ's Step Five conclusion is erroneous because it failed to resolve a conflict between the VE's hearing testimony and the Dictionary of Occupational Titles ("DOT") reasoning levels. (Dkt. #16-1 at 37-39.) Two of the jobs that the VE testified that Plaintiff could perform are Routing Clerk and Marker, both of which have a reasoning development level of 2. (R. 1987.) Reasoning level 2 jobs require the application of "common sense understanding to carry out detailed but uninvolved written or oral instructions." (Dkt. #16-1 at 38.) Plaintiff argues that the ALJ failed to question the VE at the hearing about an apparent conflict between the DOT reasoning level 2 jobs and the ALJ's RFC which limited Plaintiff to "simple, routine, repetitive tasks." *Id.* at 38-39 (citing R. 1977).

As Defendant correctly notes, courts within the Second Circuit have previously held that restrictions limiting a Plaintiff to "simple work" do not conflict with a DOT reasoning level of 2. Dkt. #19-1 at 27; *see Freitas v. Colvin*, No. 3:14-cv-789 (DFM), 2016 U.S. Dist. LEXIS 177221, at *14 (D. Conn. Dec. 22, 2016) ("Judges in this district have held that limitations to 'short, simple instructions' are not inconsistent with reasoning development level 2.") (collecting cases). Therefore, a reasoning level 2 job is not inconsistent with Plaintiff's RFC, and there was no conflict between the DOT and the VE's testimony regarding the reasoning level of the Routing Clerk and Marker jobs. And, because the VE testified that there are over 250,000 available jobs in the national economy between Routing Clerk and Marker occupations, R. 2017, the ALJ did not commit reversible error in his Step Five finding on this basis. *See Hernandez v. Berryhill*, No. 3:17-cv-368 (SRU), 2018 U.S. Dist. LEXIS 52921, at *53 (D. Conn. Mar. 29, 2018) ("[C]ourts in this District have routinely held that numbers below 30,000 are sufficient to satisfy the 'significant number' threshold.").

Second, Plaintiff argues that the ALJ erred because he relied on VE testimony that did not include a proper explanation of the methodology used. (Dkt. #16-1 at 39-40.) At the hearing, the VE relied on a private computer program, Job Browser Pro, to analyze data from the Bureau of Labor Statistics and compute

relevant job numbers in the national economy. (R. 2024.) When questioned by Plaintiff's counsel, the VE was unable to explain how Job Browser Pro arrived at its figures. *Id.* Plaintiff therefore argues that substantial evidence does not support the ALJ's Step Five conclusion. (Dkt. #16-1 at 40.) The Court disagrees.

In his decision, the ALJ found that the VE's testimony was reliable. Specifically, the ALJ stated that the VE relied on "administratively recognized sources," which are "commonly used" and "professionally recognized." (R. 1988.) In *Saad v. Berryhill*, the Honorable Kari A. Dooley noted that it is "enough for the vocational expert to identify 'the sources he generally consulted to determine' the availability of jobs, even if he does not provide 'specific information.'" *Saad v. Berryhill*, No. 3:17-cv-2000 (KAD), 2019 U.S. Dist. LEXIS 54904, at *10 (Mar. 29, 2019) (quoting *Brault*, 683 F.3d at 450); *see* also *Vilma Seranno S. v. Kijakazi*, No. 22-cv-214 (KAD), 2023 U.S. Dist. LEXIS 56151, at *23 (D. Conn. Mar. 31, 2023) (finding that, "given the flexibility of the substantial evidence standard . . . VE testimony that draws on reports obtained from Job Browser Pro can satisfy the Commissioner's burden at Step Five"); *Debiase v. Saul*, No. 3:19-cv-68 (RMS), 2019 U.S. Dist. LEXIS 184847, at *36 (D. Conn. Oct. 25, 2019) (noting that "the Second Circuit does not require a detailed scrutiny of a

vocational expert's methods"). The ALJ further opined that the VE was well-qualified "based upon his extensive experience performing vocational evaluations." (R. 1988.) The ALJ did not err at Step Five.

## CONCLUSION

Based on the foregoing, Plaintiff's Motion for an Order Reversing or Remanding the Commissioner's Decision (Dkt. #16) is DENIED and the Commissioner's Motion to Affirm the Decision (Dkt. #19) is GRANTED.[15] This is not a recommended ruling. The consent of the parties allows this Magistrate Judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3).

It is so ordered this **22nd** day of **September 2026**, at Hartford, Connecticut.

/s/

Robert A. Richardson
United States Magistrate Judge

[15] Plaintiff raises an argument in her Reply Brief that the matter should be remanded for the "sole purpose" of calculating benefits. (Dkt. #22 at 7-10.) Because Plaintiff's Motion to Remand is denied, the Court finds that issue moot.